IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| GLENNA BURRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:05-CV-409 |
| | ) |
| HARTFORD LIFE AND ACCIDENT | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

This civil action is brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. It is now before the court for consideration of "Plaintiff's Motion for Judgment on the Administrative Record" [doc. 10] and the "Motion for Judgment on the Record" [doc. 11] filed by defendant, Hartford Life and Accident Company ("Hartford"). Hartford has responded to plaintiff's motion [doc. 14], and plaintiff, Glenna Burris ("Burris"), has responded to Hartford's motion [doc. 13]. For the reasons stated herein, Burris's motion will be denied, Hartford's motion will be granted, and judgment will be entered in favor of Hartford.

I.

*Procedural Background*

Hartford issued to Wal-Mart Stores, Inc. an insurance plan (the "Plan" or "Policy") that provides short term disability ("STD") benefits. [A.R. 002, 048, 082].[1] Wal-Mart is the Plan administrator. [A.R. 048]. Hartford is the claims administrator. [A.R. 086].

Burris worked at Wal-Mart as a salesfloor associate from 1999 until July 2004. She filed a claim for STD via telephone on July 27, 2004, advising that she could not work due to a cyst on her back. [A.R. 144].

Hartford denied Burris's STD claim by letter dated August 6, 2004, stating that she was not "Totally Disabled" under the terms of the Policy but allowing her to submit additional documentation for reconsideration of her claim. [A.R. 151]. For STD purposes, the Plan defines "Totally Disabled" as

> unable to do the material and substantial duties of your occupation. Your occupation includes similar job positions with the employer which may be offered to you with a rate of pay 60% or greater of your predisability earnings.

[A.R. 090].[2]

Burris submitted additional information, but Hartford denied her claim a second time by letter dated August 12, 2004. [A.R. 670]. Hartford again upheld its claim via a letter dated September 17, 2004 [A.R. 661], and on February 4, 2005, Hartford

---

[1] References to "A.R." indicate a page or pages of the administrative record.

[2] Plaintiff's salesfloor associate position required, *inter alia*, frequent lifting and carrying of items weighing fifty pounds or more while climbing a ladder. [A.R. 185].

2

acknowledged receipt of Burris's appeal. [A.R. 646]. Hartford informed Burris on June 17, 2005, that it was affirming its decision to deny her STD benefits. [A.R. 154]. Burris filed this lawsuit on August 2, 2005.

II.

*Standard of Review*

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115. However, if a plan grants the administrator or fiduciary the appropriate discretionary authority, this court must review the decision at issue under the "highly deferential arbitrary and capricious standard of review . . . ." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). A plan's grant of discretionary authority to the administrator or fiduciary must be "express." *Perry v. Simplicity Eng'g,* 900 F.2d 963, 965 (6th Cir. 1990); *see also Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) (requiring "a *clear* grant of discretion") (emphasis in original).

Decisions concerning eligibility for ERISA benefits are not arbitrary and capricious if they are "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something

3

important or seriously erred in appreciating the significance of evidence." *Marchetti v. Sun Life Assurance Co. of Canada*, 30 F. Supp. 2d 1001, 1008 (M.D. Tenn. 1998) (citing *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir. 1996)).

The Policy contains the following provision:

**INTERPRETATION OF POLICY TERMS AND CONDITIONS**

The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

[A.R. 086]. Burris acknowledges the existence of this language but argues that a *de novo* review is required because the grant of discretion is to the claims administrator and not to the Plan administrator, Wal-Mart. The court does not agree.

In *Garst v. Wal-Mart Stores, Inc.*, 30 F. App'x 585 (6th Cir. 2002), the Sixth Circuit stated that the plan before it "designated Hartford as its claims administrator, giving Hartford discretionary authority to resolve all questions concerning the administration, interpretation or application of the Plan." *Id*. at 588. The Court then noted it would review "the district court's grant of summary judgment to determine if there is any genuine issue of material fact whether the insurance company's decision to deny benefits was arbitrary or capricious." *Id*. (citation and quotation omitted). This court concludes that, like in *Garst*, the grant of discretion to the claims administrator in this case is sufficient to trigger the arbitrary or capricious standard of review. The court will apply that standard in its review of Hartford's decision. *See also Bruch,* 489 U.S. at 115 (considering the amount of

4

discretion given to "the administrator *or* fiduciary") (emphasis added); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 n.2 (6th Cir. 1991) (applying arbitrary or capricious standard where discretion was granted to the insurer/claims administrator).

Plaintiff does correctly note that there is an inherent conflict of interest in this case because Hartford is the decision maker for disability benefits claims as well as the entity that pays benefits. However, the existence of such a conflict does not alter the standard of review. *Marchetti*, 30 F. Supp. 2d at 1007. Rather, the administrator's conflict of interest is a factor considered by the court in its review of the administrative decision. *See id.; Miller*, 925 F.2d at 984. The court will accordingly consider this inherent conflict of interest as a factor in determining whether Hartford's decision was arbitrary or capricious.

III.

*Administrative Record*

Beginning in at least 2002, Burris reported periodically to Drs. Howard McNeeley and Ronald Wray with abdominal and stomach complaints. [A.R. 203-10, 354, 357]. On June 30, 2004, Burris complained of knee pain secondary to playing tennis. [A.R. 211]. Two weeks later, she continued to report abdominal problems and had a temperature of 102. [A.R. 212]. The findings of an emergency room doctor were "pretty benign." [A.R. 212].

On July 20, 2004, Burris reported "a lot" of back pain. Dr. McNeeley observed "a soft tissue mass palpable, freely moveable" and referred her to an orthopedic surgeon.

5

[A.R. 213]. On July 27, 2004 - the date she applied for STD benefits - Burris told Dr. McNeeley that the surgeon was presumably going to remove the cyst from her back. [A.R. 213].

In a July 29, 2004 Attending Physician's Statement of Disability ("APS"), Dr. McNeeley deferred disability-related questions to the orthopedist. [A.R. 214-15]. A July 30, 2004 MRI showed a "small" herniation at L5-S1, possible bone marrow disease, and "mild" concentric bulging at L4-5 and L2-3. [A.R. 234]. A subsequent APS by Dr. William McAlexander stated that Burris should, for an undetermined period of time, engage in no strenuous activity or excessive standing due to lumbar pain and tenderness. [A.R. 216].

Burris continued to report back pain to Dr. McNeeley in August and September of 2004. A September 7, 2004 bone scan showed mild degenerative changes involving the AC joints but "no lumbar spine abnormality or hip abnormality." [A.R. 235].

Burris saw cancer specialist Kevin Ridenhour on October 1, 2004. [A.R. 245]. She reported back pain, abdominal pain, fevers, and a weight loss of thirty pounds since March 2004, but was described by Dr. Ridenhour as "a well appearing female in no distress." [A.R. 245-46]. Subsequent testing was negative for lymphoma, leukemia, or bone marrow disease, although Burris continued to report dramatic weight loss and fevers. [A.R. 250]. Dr. Ridenhour further noted that the back cyst which generated Burris's STD claim and subsequent "extensive evaluation is likely a fatty infiltration and not a malignant process." [A.R. 250].

6

On October 21, 2004, Dr. McNeeley wrote to Hartford:

> Ms. Burris has been under my care with regard to on-going health problems she has been experiencing since July of this year. She has been unable to work due to this condition since July 24, 2004 . . . .
>
> Ms. Burris has been suffering with fever, back pain, weight loss, weakness and debilitating fatigue during this time that she has been unable to work. She has had numerous tests including an MRI, which indicated a herniated disc and two bulging discs as well as an apparent bone marrow abnormality. She has been referred to multiple specialists for additional treatment and testing due to these findings yet, to my knowledge, there has been no definitive diagnosis reached to explain all her complaints. . . .
>
> It is my opinion that Ms. Burris has been unable to work due to her medical condition since July 24, 2004. Even without a specific diagnosis to explain the battery of her complaints she does still suffer with these symptoms and they have been severe enough to warrant her absence from work. Her back ailments alone would have prevented her from working, as she is unable to sit or stand for any length of time and she must be able to reposition herself as she finds necessary in order to remain comfortable. . . . When her other problems are taken into consideration, it is inconceivable that she would be able to perform the routine job duties associate [sic] with her position as an associate at Wal-Mart.

[A.R. 220].[3]

On November 9, 2004, Burris presented to Dr. J. David Lee with digestive complaints, "[f]ever at times [and] [u]nintentional 40 pound weight loss" since July 2004. [A.R. 270].[4] Dr. Lee offered treatment for the digestive complaints but otherwise described

---

[3] On May 17, 2005, Dr. McNeeley wrote "To Whom It May Concern" that Burris continues to report the following problems "related to her back" - pain, depression, fatigue, and loss of appetite. [A.R. 182].

[4] The court notes that in May 2004, Burris told Dr. Lee that she had lost thirty pounds over the prior eight months. [A.R. 279].

7

Burris as "a pleasant patient in no apparent distress." [A.R. 274].

On January 17, 2005, Burris saw neurologist Choudhury Salekin (apparently for worker's compensation evaluation) with a chief complaint of "[b]ack pain for two to three years progressively getting worse." [A.R. 191]. Burris appeared to be in no acute distress but demonstrated weakness of the right leg. [A.R. 192]. Plaintiff also exhibited decreased sensation to pin prick at the L4, L5, and S1 dermatomes. [A.R. 194]. Dr. Salekin assigned a 13% whole body impairment as of July 2004, citing Burris's MRI and concluding that she suffers from

> Right L4, L5 radiculopathy and right S1 radiculopathy, most likely from herniated disc irritating the L4, L5 and S1 nerve roots. Herniated and bulging disc developed from frequent lifting of produce boxes, along with pushing, pulling and stacking of produce for many years.

[A.R. 193-96]. Dr. Salekin further predicted limitations of lifting, carrying, standing, walking, sitting, pushing, pulling, stooping, crouching, crawling, and twisting which would collectively render Burris unable to engage in full-time employment. [A.R. 197].

At Hartford's request, Dr. F.B. Dibble, Jr. generated a June 15, 2005 Medical Report. [A.R. 161]. Dr. Dibble did not examine plaintiff but reviewed and discussed the entire file, including the records of Drs. Wray, McNeeley, Ridenhour, Lee, and Salekin. [A.R. 161-66]. He also spoke by telephone with Drs. Lee, Salekin, and McNeeley. [A.R. 165]. Of note, Dr. McNeeley could not offer any opinion "about her physical capabilities or limitations relative to her back pain symptomatology." [A.R. 167]. Neither Dr. Lee nor Dr. McNeeley could recall any physical limitation or obvious pain demonstrated in Burris's

8

movement. [A.R. 167-70]. Dr. Dibble concluded that Burris has

> a chronic back pain syndrome, based on degenerative disc disease. While she has been said to have radiculopathic findings, this has not been consistently reported by her various examiners. *She has significantly embellished her symptomatology regarding weight loss and ongoing fevers.* She has been thoroughly evaluated for hematologic and gastrointestinal abnormalities to explain nonspecific upper and lower abdominal pain, without significant findings. . . . She discontinued her employment on 7/14/04, but there is no clear-cut evidence of any physically limiting condition identified at that time.
>
> . . . There is no consistent evidence of any specific physical limitation that would preclude her from any particular activity of employment. Because of her diagnosis of irritable bowel syndrome, she may, on an intermittent basis, require frequent access to bathroom facilities.

[A.R. 165-66] (emphasis added).

IV.

*Analysis*

The court has reviewed the record concerning the denial of benefits in this case under the arbitrary and capricious standard and in so doing has taken into account the pecuniary conflict of interest as a factor in the analysis. With regard to the application of this standard, the Sixth Circuit has stated: "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F. 2d 689, 693 (6th Cir. 1989) (citation omitted). The arbitrary and capricious standard is the "least demanding form of judicial review of administrative action." *Id.* In its review of the denial of benefits, this court does not substitute its judgment for that of the administrator. *Brown v. Nat'l City Corp.*, 974 F.

9

Supp. 1037, 1041 (W.D. Ky. 1997) (citing *Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir. 1993)).

In its final denial of Burris's appeal, Hartford referenced its prior three denial letters, each of which explained that the evidence of record was insufficient to establish disability. Hartford's final denial also cites at length Dr. Dibble's conclusions. Burris argues that reliance on the report of nonexamining physician Dibble was arbitrary and capricious in light of the opinions of Drs. McNeeley, McAlexander, and Salekin. The court does not agree.

As an initial matter, the court must address the reliability of Burris's subjective complaints, upon which the McNeeley, McAlexander, and Salekin opinions are each based to a significant degree. Burris's repeated subjective complaints include weakness, fatigue, and pain. On the facts of this case, her claims of extreme weight loss and recurring fevers are considered subjective in nature as well. To be certain, the July 30, 2004 MRI showed a "small" herniation and two instances of "mild" disc bulging, which *could* account for the pain alleged. Testing has otherwise failed to generate an explanation for the other subjective complaints, and Burris's credibility is thus an issue in the evaluation of her claim.

Clearly, Hartford did not credit Burris's subjective complaints. In its final denial, Hartford cited Dr. Dibble's finding that Burris "has significantly embellished her symptomatology regarding weight loss and ongoing fevers." [A.R. 155]. If the evidence indicates that the fever and extreme weight loss complaints are unreliable, then the claims

of pain, weakness, and fatigue - along with Burris's STD claim as a whole - also become suspect.

On October 7, 2004, Dr. McNeeley noted "weight loss" but did not record Burris's weight. [A.R. 219]. On October 1, 2004, Burris told Dr. Ridenhour that she had lost thirty pounds since March 2004. [A.R. 245-46]. Her weight was, again, not recorded. On November 9, 2004, Burris told Dr. Lee that she had unintentionally lost forty pounds since July 2004 [A.R. 270], having previously told that same physician in May 2004 that she had lost thirty pounds over the prior eight months. [A.R. 279]. There is no indication that she was weighed by Dr. Lee's office at either of these appointments. Lastly, in January 2005, Burris reported a thirty pound weight loss over the prior six months. [A.R. 303]. Her weight that day was 137 pounds. [A.R. 332, 336]. The *objective* evidence of record elsewhere charts Burris's weight as follows:

| | |
|---|---|
| September 18, 2002 | 152 pounds [A.R. 354] |
| July 21, 2003 | 142 pounds [A.R. 373] |
| September 2, 2003 | 142 pounds [A.R. 374] |
| November 19, 2003 | 146 pounds [A.R. 357] |
| April 19, 2004 | 139 pounds [A.R. 208] |
| July 20, 2004 | 138 pounds [A.R. 213] |
| July 23, 2004 | 137 pounds [A.R. 358] |
| July 27, 2004 | 138 pounds [A.R. 213] |
| December 29, 2004 | 140 pounds [A.R. 223] |

The record therefore, at best, documents a *gradual* loss of no more than fifteen pounds occurring over a period of more than two years. The objective evidence plainly does not support Burris's *repeated* claims to multiple sources of an unintentional loss of

11

approximately *twenty percent or more* of her body weight occurring in 2004.

As for her complaints of recurring and disabling fevers, Dr. McNeeley noted in January 2004 that Burris "has had fever." Although she reported fevers of up to 100.4 degrees, her temperature at the doctor's office that day was 98.1. [A.R. 206]. On July 12, 2004, she reported a 100.1 degree temperature the previous night but was only 99.0 in the doctor's office. [A.R. 212]. On October 11, 2004, Burris referred to her intermittent fevers "which cause[] her to almost soak her pillowcase." Her temperature that date was 98.6. [A.R. 250]. On November 1, 2004, she reported a 99.8 degree fever the previous night but was only 98.8 in the doctor's office. [A.R. 219]. On November 16, 2004, complaining of fever and fatigue, Burris obtained a refill of her narcotic pain medication. Her actual temperature that day was 98.1. [A.R. 222]. On December 29, 2004, Burris complained of "recurrent fever . . . off and on since July." Dr. McNeeley did not record her temperature that date but did again refill her narcotic prescription. [A.R. 223]. The administrative record documents the following additional temperatures:

>     May 3, 2004           98.6 [A.R. 279]
>     July 15, 2004         102.0 [A.R. 212]
>     July 20, 2004         98.7 [A.R. 213]
>     July 23, 2004         97.7 [A.R. 358]
>     August 25, 2004       98.0 [A.R. 217]
>     September 20, 2004    98.7  [A.R. 218]
>     October 1, 2004       98.7 [A.R. 246]
>     October 7, 2004       99.3. [A.R. 219]
>     October 11, 2004      98.6 [A.R. 250]
>     January 11 & 12, 2005 98.4 & below [A.R. 325, 335, 340]

12

In sum, the objective evidence shows only a single instance of significant fever in 2004. Even on that date, emergency room findings were "pretty benign." [A.R. 212]. The administrative record thus provides a "reasoned explanation" for Hartford and Dr. Dibble's conclusion that Burris has "significantly embellished" her claims of disabling fevers and extreme sudden weight loss.

As for Dr. McNeeley's October 21, 2004 letter, the court observes multiple flaws in addition to the reliance on Burris's embellished subjective complaints. Dr. McNeeley cites the July 2004 MRI as in part "indicat[ing] . . . an apparent bone marrow abnormality." [A.R. 220]. Dr. McNeeley noted in August 2004 that "her biggest concern with me on her MRI is the bone marrow abnormality rather than the bulging herniated disk." [A.R. 217]. However, prior to the creation of his October 2004 letter, Dr. McNeeley was already aware that Burris's "<u>bone marrow biopsy was normal</u>." [A.R. 218-19] (emphasis added). Further, by report dated October 15, 2004 (again prior to the creation of the October 21 letter), orthopedist Paul Johnson told Dr. McNeeley that "insofar as her back and hip were concerned, I think it would be reasonable for her to return to work." [A.R. 352]. Also, in July 2004 and June 2005, Dr. McNeeley would not give an opinion regarding functional limitations because he "had not had any direct involvement with her orthopedic assessment[.]" [A.R. 167, 214-15].

As for Dr. McAlexander's APS, that opinion is based in significant part on complaints of pain [A.R. 216] and is thus of limited value due to the dubious nature of

13

Burris's subjective claims. The extremely restrictive opinion of Dr. Salekin is also based in part on Burris's subjective complaints. [A.R. 195]. Although Dr. Salekin also cites objective evidence (the July 2004 MRI and his personal observations), his sole January 2005 examination was conducted six months after Burris's STD application date. In contrast with Dr. Dibble's evaluation, there is no indication that Dr. Salekin's review, which was apparently for worker's compensation purposes, included the entire medical record or that he spoke with physicians who had treated Burris during the relevant time period.

The court finds Dr. Dibble's cumulative file review to be more thorough and objectively supported than any of the opinions cited by Burris. Hartford did not act arbitrarily or capriciously in its reliance on Dr. Dibble. There is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination[,]" particularly where - as here - the review was thorough. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295-96 (6th Cir. 2005).

Lastly, it cannot be ignored that the back cyst upon which Burris's STD claim is based has been found to be "likely a fatty infiltration and not a malignant process." [A.R. 250]. Further, although Burris has presented digestive complaints since at least 2002 [A.R. 354, 357], the court notes that she continued to work and play tennis despite that alleged condition. As noted above, the July 2004 MRI certainly provides objective evidence through which Burris's subjective pain complaints *could* be credited. However, because the evidence reasonably supports the conclusion that Burris has significantly embellished her subjective

reporting, Hartford should not be required to accept that her "small" and "mild" back problems have caused the limitations alleged. Even agreeing with Dr. Dibble's statement that Burris suffers from a chronic back pain syndrome, Hartford did not act arbitrarily or capriciously in finding that this condition does not render Burris totally disabled under the Plan.[5]

V.

*Conclusion*

The court cannot say that Hartford's denial of STD benefits was irrational, unfounded, or without reasoned explanation. In reaching this conclusion, Hartford's inherent conflict of interest in its dual roles of claims administrator and payor has been considered. Nonetheless, under the circumstances of this case and the administrative record as discussed above, it was neither unreasonable nor irrational for Hartford to decide that Burris is not "Totally Disabled" as that term is defined by the Plan.

Accordingly, the court will affirm Hartford's denial of STD benefits. An order reflecting this opinion will be entered.


ENTER:


          s/ Leon Jordan
          United States District Judge

---

[5] Based on these observations, the court would affirm Hartford's decision even under an application of the *de novo* standard of review.